IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TRAVIS STEWART,

     Plaintiff,

   v.

SALEM SYED, JAMIE GOHDE,
DENISE VALERIUS, KERRY BUECHNER,

     Defendants.

OPINION and ORDER

Case No.  18-cv-003-wmc

---

*Pro se* plaintiff Travis Stewart, who was previously incarcerated at Columbia Correctional Institution ("Columbia"), is proceeding in this lawsuit pursuant to 42 U.S.C. § 1983, against four health care professionals who were working at Columbia in 2016 and treated him for complaints about foot pain and an ingrown toenail.  In particular, the court granted Stewart leave to proceed on Eighth Amendment and Wisconsin negligence claims related to how defendants handled his medical care between June 18 and August 13, 2016. Currently before the court are Stewart's motion for sanctions (dkt. #41), which the court will deny, and defendants' motion for summary judgment (dkt. #34), which the court will grant in part and deny in part.  As to the latter motion specifically, since the evidence of record would not permit a reasonable jury to find that defendants Gohde, Valerius and Buechner handled Stewart's ingrown toenail and associated pain with deliberate indifference, these defendants are entitled to judgment on the merits as to Stewart's Eighth Amendment claims, and the court relinquishes jurisdiction over Stewart's remaining state law claims against them.  However, Dr. Syed is not entitled to judgment in his favor with respect to his decision to cancel an order for pain medication while Stewart waited to have

1

his ingrown toenail removed, and with respect to how he handled Stewart's pain management during and after the partial removal of his toenail, so Stewart's deliberate indifference and negligence claims against Dr. Syed will proceed to trial.

## UNDISPUTED FACTS[1]

### A. Parties

Travis Stewart was incarcerated at Columbia in July of 2016, when the events comprising his claims took place, and where all defendants were working. The defendants include Dr. Salem Syed, a physician who worked at Columbia from 2014 until 2018; Jamie

---

[1] Unless otherwise noted, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party. Stewart did not submit a declaration in support of his response to defendants' proposed findings of fact. Nonetheless, the court has accepted Stewart's factual assertions in his proposed findings of fact and responses, to the extent his assertions may reasonably be within his personal knowledge, since Stewart signed his responses to defendants' proposed findings of fact under penalty of perjury, citing 28 U.S.C. § 1746. (*See* dkt. #59, at 20.) This court is entitled to construe *pro se* submissions leniently, and may overlook Stewart's noncompliance with the rules. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). As such, the court accepts the factual averments within those submissions (to the extent those statements could be within Stewart's personal knowledge) as Stewart's supporting evidence. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (accepting that a verified complaint "is also the equivalent of an affidavit for purposes of summary judgment"). Additionally, defendants object to some of Stewart's proposed findings of fact as relying on unauthenticated evidence, but the court has also considered this evidence if there is a basis to reasonably believe that evidence would be admissible at trial. *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) ("To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible.") (citations omitted). That said, defendants fairly point out that some of Stewart's responses are argumentative or non-responsive, or cite to evidence that does not support his version of the facts. Those objections are upheld and noted as appropriate in the recitation of the facts. *See Proc. to be Followed on Mot. For Summ. Judg.*, § II(C), (E); *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2011) (courts are to consider only evidence set forth in proposed finding of fact with proper citation).

Gohde, who previously worked there as the Health Services Manager ("HSM") and nurse; and Kerry Buechner[2] and Denise Valerius, who previously worked there as nurses.

### B. Columbia's Health Services Unit Practices

If a prisoner at Columbia needs to be seen for a non-emergency medical issue, he must submit a Health Services Request ("HSR") to the Health Services Unit ("HSU"). HSU staff attempt to triage all HSRs received within 24 hours of receiving them on weekdays, and within 72 hours if the HSR is received during the weekend. If the request in the HSR is urgent or emergent, staff arrange for a same-day appointment, if possible, for evaluation by a health care provider. On HSRs, prisoners can indicate their desire to see HSU staff, or not, by checking the appropriate box on the form.

If a prisoner believes he has a more immediate need for health care, he may also request a sick call using form DOC-3035. HSU staff triage those forms as well, and when a sick call is scheduled, prisoners are seen by nursing staff, who then determine whether each prisoner needs to be referred to a doctor. During these sick calls, the health care professionals involved are to make timely assessments, provide treatment, and schedule follow-up, all in accordance with protocols and clinical priorities. Finally, if a prisoner has a true health emergency, the prisoner may notify an officer or any staff member that he needs to be seen immediately.

---

[2] Buechner was formerly known as Kerry *Newbury*, the name plaintiff used in identifying her in his complaint. Accordingly, the court identifies Buechner by her current name, rather than the name identified in the screening order.

Although HSU nursing staff can attempt to schedule appointments with doctors, advance nurse practitioner's or other advance care providers ("ACPs"), they do not have control over the ACPs' schedules. As a result, sometimes prisoner appointments need to be rescheduled because an ACP's schedule changed or the provider had been pulled away from emergency reasons.

Nursing staff, including registered nurses, are not authorized to order testing, diagnose, or prescribe medication. According to Gohde, this limitation includes *modifying* existing patient medication prescriptions. Even over the counter ("OTC") drugs may only be dispensed per nursing protocol. Similarly, only ACPs may order outside appointments, surgeries, consultations or visits with specialists. Nurses do not have the authority to order any of these types of interventions.

To obtain refills of any prescribed medications, prisoners may complete a Medication/Medical Supply Refill Request form and submit it to the HSU. In fact, prisoners are *responsible* for ensuring they submit refill requests at least one week prior to running out of medication. Upon receipt of a Medication/Medical Supply Refill Request form, HSU staff forward it to the Medication Room, where staff pull medications from Columbia's stock (or from the central pharmacy in Waupun, Wisconsin), if submitted within the prescription time limit, and the medication is then delivered to the appropriate housing unit. If a prescription is expired, nursing staff forward a copy of the order to the physician to determine whether to refill the prescription.

An HSM's duties do *not* normally involve providing direct care to patients. In particular, according to HSM Gohde, she did not provide any care to Stewart or respond

to any of his HSRs during the time period relevant to this lawsuit.[3]  According to Gohde, even when a prisoner directs an HSR to her, the HSU's triaging process would not necessarily involve passing it directly to her.  Rather, nursing staff would typically review and triage that HSR, just like any other HSR, and if appropriate, schedule an appointment.

### C. Stewart's 2016 Medical Care for Pain in his Shoulder, Foot and Ingrown Toenail

On March 1, 2016, Stewart arrived at Columbia from another institution.  From that point until his transfer to the Wisconsin Resource Center ("WRC") in September 2016, Stewart submitted *63* separate HSRs, as well as numerous information requests.  Of those 63 HSRs, Stewart complained about foot pain or ingrown toenail pain in 23.

On March 8, Stewart submitted an HSR requesting a medical appointment for a "skin and feet problem."  That same day, defendant Nurse Buechner responded by checking the box on the HSR that indicates Stewart was scheduled to be seen by HSU. (Ex. 500 (dkt. #39-1) 90.)  Buechner examined Stewart the next day, when he complained that his feet hurt in state-issued boots and that he wanted to wear his own shoes.  Buechner observed that Stewart was flat-footed, and his feet were red and appeared to be rubbing,

---

[3]  Stewart disputes this fact, asserting that Gohde "is directly involved in all HSU decisions that relate to the care of Stewart or any other inmates at [Columbia] and involved in weekly meetings with her staff."  The evidence he cites in support, however, is "Evidence Exh. P-2," which does not appear in the evidence he submitted in support of his response to defendants' proposed findings of fact.  In fairness, Stewart did attach over 200 pages of HSU records to his response, which he may have intended to be his "Exh. P-2."  Even assuming this to be the case, however, Stewart does not offer even one instance in which Gohde responded to an HSR or otherwise handled his medical care during the time frame relevant to his claim.  As such, the court must accept defendants' proposed factual finding as undisputed.

but she did not record any abnormalities with his feet.  Therefore, she ordered ibuprofen and ice for one month.  (*See* Ex. 500 (dkt. #39-1) 159-60.)

On March 29, Stewart submitted an HSR complaining of major pain in his feet and requesting medical assistance.  The next day, Stewart had a sick call visit with a nurse.[4]  A few days later, on April 4, Dr. Syed met with Stewart.  Dr. Syed observed that Stewart had a history of plantar fasciitis and mildly flat feet.  (Syed Decl. (dkt. #37) ¶ 10.)  He also noted that Stewart reported pain, which was greater in his right foot than his left foot.  Dr. Syed then ordered Stewart ibuprofen, 600 mg, daily for six months, and allowed Stewart to wear his personal shoes to address his plantar fasciitis.  (Ex. 500 (dkt. #39-1) 162, 134, 106.)  Dr. Syed attests that Stewart did not complain about an ingrown toenail during this visit which is consistent with his contemporaneous notes, nor does Stewart attest otherwise.

On April 9, Stewart submitted an HSR asking that his shoe restriction be entered in the computer.  Defendant Nurse Valerius responded that day, informing Stewart that his shoe restriction had, indeed, been entered in the computer.  However, Stewart disputes that Valerius entered his restriction into the computer, and he claims that this failure prevented him from wearing his personal shoes, causing him to suffer pain from wearing the state boots.  (*See* Ex. 500 (dkt. #39-1) 78.)

---

[4]  Stewart disputes this proposed finding of fact, asserting that defendant "failed in her duty to evaluate and assess the plaintiff's medical condition, thereby denying the plaintiff adequate medical care."  However, Stewart cites the same portion of his medical records that defendants cite, and he does not dispute that he was visited during sick call on March 30, 2016.

On April 12, Stewart submitted an HSR requesting a visit with "Dr. Syed or whom it may concern," to discuss his foot pain.  (*Id.* at 75.)[5]  Non-defendant, Nurse Thorne, responded that day, indicating that Stewart was scheduled for an appointment with the doctor.  On May 7, the HSU received an HSR, dated May 5, in which Stewart again requested a follow-up visit with Dr. Syed to address his feet.  Stewart again did not raise a concern with an ingrown toenail specifically, rather writing that he needed to be seen for his "feet."  (Ex. 500 (dkt. #39-1) 60.)  Valerius responded on May 7, indicating that his doctor's appointment was "upcoming."  Stewart claims that because it was answered two days later, he was left in severe pain during that time.

On May 11, Stewart submitted yet another HSR asking for a medical visit, as well as for a prescription for gabapentin to address his pain, although Stewart did not identify the source of his pain in that HSR.  However, a nurse responded that Stewart's appointment was scheduled that day, and Dr. Syed met with Stewart later that day, for the purpose of addressing his hypertension and dyslipidemia.  According to Dr. Syed, Stewart did not report foot pain generally or an ingrown toenail pain specifically.  Rather, Stewart was requesting benzodiazepines and gabapentin, highly addictive pain medications that Dr. Syed did not believe were justified given Stewart's complaints.  Therefore, following the appointment, Dr. Syed wrote a prescriber's order for ice bags three times a day, for six weeks to address Stewart's complaints of pain for his shoulder.

---

[5]  Stewart claims that he wrote the HSR on April 10, but the evidence he cites in support (*see* Ex. 500 (dkt. #39-1) 75), does not indicate he submitted the HSR on April 10.  Rather, although Stewart dated the HSR April 10, it was stamped as received on April 12.  (*Id.*)

Although Stewart disputes this May 11 interaction as represented by defendants, he does not attest that he specifically reported foot or toenail pain to Dr. Syed that day. Furthermore, the evidence he cites in support also does not indicate that he reported toenail pain. Rather, he cites evidence that doctors at WRC *later* treated him with gabapentin and Lyrica to treat his chronic foot pan. The court accepts as undisputed that Stewart was prescribed those medications at WRC, but Stewart has not submitted evidence disputing Dr. Syed's assertion that on May 11, 2016, at least, Stewart did not complain about foot or ingrown toenail pain.

On June 11, Stewart submitted an HSR requesting a refill of his ibuprofen, 600 mg, because he did not have any medication refill forms. Nurse Valerius responded by providing him the medication refill form. On June 14, Stewart complained of foot and shoulder pain, to which nursing staff responded that he was scheduled for a sick call, and on June 17, non-defendant, Nurse Anderson, saw Stewart for foot and shoulder pain. Anderson ordered an ibuprofen refill, referred him for scheduling with an ACP, and advised Stewart to submit HSRs if his pain did not improve.

On June 28, Stewart submitted two HSRs: one complained of knee and shoulder pain and one asked for Tylenol. In particular, Stewart complained "I'm in severe pain and need to see someone ASAP because I'm unable to sleep. My knee and foot hurt Very Badly." (Ex. 500 (dkt. #39-1) 41-42.) Nurse Buechner responded that day, writing that Stewart was scheduled for a doctor's appointment, that ibuprofen was ordered, but that Tylenol had not been ordered.

8

On July 6, Stewart submitted an HSR complaining of major pain in his shoulder and foot, asking for a cuff in front restriction and stating for the first time that it was an emergency. Nurse Anderson responded that Stewart was treated that day by nursing staff, who did examine Stewart; although his chief report was right shoulder pain, he also raised a concern about his foot. (Ex. 500 (dkt. #39-1) 39.) Nursing staff refilled his ibuprofen prescription and referred his cuff in front request to the special needs committee.

On July 19, Stewart submitted an HSR complaining about his foot pain and that ibuprofen and naproxen were not helping, although he did not specifically mention ingrown toenail pain. Nursing staff responded that Stewart was scheduled for a doctor's appointment. On July 21, Stewart submitted an HSR complaining for the first time of pain from an infection or ingrown toenail, and again requesting to see a doctor. Nurse Buechner again responded that a doctor's visit was scheduled. The next day, after not being seen, Stewart submitted another HSR reporting major pain and an infection in his toe, stating that this situation was also an emergency. On July 23, Nurse Valerius again responded that a doctor's appointment was scheduled for that week. The next day, July 24, 2016, Stewart submitted an HSR asking to speak with someone about his excessive weight gain. Nurse Valerius responded that he could address it with the doctor at his upcoming appointment.

On July 25, roughly a week after Stewart first complained about toenail pain and three days after describing it as an emergency, Dr. Syed examined Stewart for his ingrown toenail pain and shoulder pain. Dr. Syed ordered that Stewart be scheduled for: (1) surgery to remove the ingrown toenail; (2) an x-ray; and (3) nortriptyline for the pain.

However, Dr. Syed later cancelled that prescription without noting why, although he observes in his declaration submitted in support of summary judgment, that Stewart had other pain relief options at that point, including "ibuprofen, 600 mg." (Ex. 500 (dkt. #39-1) 131; Syed Decl. (dkt. #37) ¶ 12.)  Dr. Syed also attests that he did not inform Stewart that his toenail would be immediately removed, only that an appointment for removal would be scheduled.  (Syed Decl. (dkt. #37) ¶ 14.)  Stewart disputes this, claiming that "there is no record of proof what Dr. Syed told the [] plaintiff," and that he was "[led] to believe that [r]emoval of his infected swollen with green drainage toenail would be immediately removed."  (Pl. Resp. to Def. PFOF (dkt. #59) ¶ 42.)  In fairness, Stewart does *not* attest that Dr. Syed expressly said the surgery would take place "immediately," and the evidence Stewart cites to dispute Dr. Syed's statement are his medical records, which do not indicate Dr. Syed reported that the surgery would or should take place immediately.

In Dr. Syed's declaration in support of summary judgment, he goes further, opining that immediate removal of the ingrown toenail was not necessary because it was not an emergency.  Dr. Syed further attests that the standard of care for an ingrown toenail is removal if the toenail is infected or penetrating the soft tissues, or the person can wait to see if it resolves on its own.  Dr. Syed also attests that toenail surgery is elective.  According to Dr. Syed, since elective surgeries are not emergencies, they may be delayed or cancelled,

giving priority to a more emergent condition requiring surgery.  (Syed Decl. (dkt. #37) ¶ 15.)[6]

On July 27, Stewart submitted an HSR asking for everything Dr. Syed had ordered during the July 25 appointment to be put in writing.  Nurse Buechner responded in relevant part: "Scheduled:  toenail removal, x-ray and diet."  (Ex. 500 (dkt. #39-1) 30.)  On July 27, Stewart submitted an HSR disputing a co-pay, and Buechner responded indicating that she was forwarding his message to the HSM.  Gohde does not believe she responded to the HSR regarding Stewart's co-pay question.

On July 31, Stewart submitted another HSR, asserting that Dr. Syed told him on July 25 that he was going to have his toenail cut out because it was infected and that he was in a lot of pain.  Valerius responded by checking the box indicating that Stewart was scheduled with the doctor, also writing "scheduled this week."  (*Id.* at 29.)  According to Dr. Syed, Stewart's surgery *was* originally scheduled for the week of July 31, but it had to be rescheduled two times.  The first time, the procedural medication, lidocaine, was out of stock and had to be reordered.  The second time Dr. Syed reported having to deal with a medical emergency that took priority over Stewart's procedure.

On August 4, non-defendant, Nurse Rowin-Fox, responded to three more HSRs from Stewart.  Stewart dated the first HSR August 2nd and directed it to HSM Gohde, writing that on July 25, Dr. Syed told him he would be brought to the HSU to have his

---

[6] Stewart claims that his surgery was not elective, that an ingrown toenail cannot heal itself, and that his chronic foot pain is considered an emergency, citing Dr. Syed's prescriber's orders, as well as the prescriber's orders from staff at WRC, who prescribed him multiple medications, including gabapentin and characterized his foot pain as "chronic." (Ex. 500 (dkt. #39-1) 116, 122, 127, 144, 163-64.)  However, none of this evidence supports his stated claim that his surgery was not elective.

toenail removed because it was "pussing green stuff that stinks and hurts so bad I can't walk and it['s] swollen, and its been like this for a month." (*Id.* at 26.) Rowin-Fox responded, "We are waiting for the procedural medication to be delivered. You will be seen as soon as we have everything needed to perform the procedure as appropriate." (*Id.*). Gohde attests that she did not review or respond to that HSR. (Gohde Decl. (dkt. #38) ¶ 18.)

The second HSR that Nurse Rowin-Fox handled was actually dated August 4 and directed to Dr. Syed. Specifically, Stewart asked whether Dr. Syed had considered his request from the week before for gabapentin to address the "nerves in his foot." Rowin-Fox responded to that HSR as well, writing that "[i]t appears as if your request to renew your gabapentin has not been granted at this time." (Ex. 500 (dkt. #39-1) 24.) In the third HSR, Stewart wrote "you <u>all</u> are being deliberate indifferent to my toe that is swollen, in so much pain its hard to walk, its seeping green/yellow smelly puss, its black and blue and is getting worse daily." (*Id.* at 23.) Rowin-Fox responded by indicating that Stewart was scheduled for a nursing visit in the HSU.

On August 6, Stewart submitted an HSR directed to Dr. Syed, complaining that HSU staff were "deliberately indifferent" to his toe and that he was in major pain, to which Nurse Valerius advised: "The removal is scheduled. The MD was called on an emergency on your previous appointment day so it had to be rescheduled." (*Id.* at 23.) Stewart purports to dispute that Dr. Syed was called away on an emergency, but submits no evidence in support.

On August 10, 2016, Stewart submitted an HSR that Buechner handled. In it, Stewart complained that Dr. Syed had prescribed new pain medication on July 25, but that he had not yet received it. Nurse Buechner responded that same day, informing Stewart that after further review, the doctor cancelled the nortriptyline order. (*Id.* at 22.) On August 12, 2016, Stewart submitted an HSR, again complaining about his ingrown toenail pain. Nurse Buechner responded that his appointment was scheduled for that day, and Dr. Syed did in fact remove part of Stewart's ingrown toenail that day -- some 18 days after he originally ordered the toenail removal and prescribed a stronger medication. That day, Dr. Syed also ordered daily dressing changes for three days, tramadol 100 mg for five days, and directed Stewart to wear sandals for three days, as well as referred Stewart to the special needs committee to reevaluate him for special order shoes.

In response, Stewart disputes that Dr. Syed removed his toenail or used lidocaine during the surgery, citing Dr. Syed's hand-written progress notes, which are difficult to read, but appear to indicate that Dr. Syed wrote "a good digital block achieved," suggesting that a numbing agent was used. (Ex. 500 (dkt. #39-1) 151.) Stewart further points out that the doctors at WRC later referred him to an off-site podiatrist to remove his infected toenail permanently. (*Id.* at 163-64, 116, 122, 127.)

Dr. Syed opines that 18 days was not an abnormal length of time for Stewart to wait, given that it was an elective surgical procedure. He also explains that the amount of time it takes for a patient to undergo an elective surgery depends on multiple factors, including the severity and seriousness of the medical need, and the provider's schedule.

On August 13, Nurse Buechner responded to an HSR that Stewart submitted on August 11, writing that his toenail had been removed and that Stewart had been seen for a dressing change on August 13.  In fact, contemporaneous notes show that Nurse Valerius changed his dressing on the 13th and observed that his toe was healing.  However, on August 14, Nurse Valerius noted that Stewart appeared for his dressing change wearing sandals but no dressing on his toe, and that he had developed a 0.5 cm diameter open wound near the tip of his right great toe, which was red and tender.

The next day, August 15, Dr. Syed examined Stewart's sore on his toe.  Dr. Syed ordered Stewart to continue wearing sandals for two weeks, continue dressings daily for two days and to return to the clinic in two to three days.  On August 16 and 17, nursing staff continued to provide Stewart dressing changes.  On August 18, Dr. Syed met with Stewart for a follow-up appointment.  Dr. Syed specifically noted that:  Stewart's right toe was healing, there was no cellulitis or infection, and Stewart was feeling better.  Dr. Syed also noted that he provided Stewart with education on taping and provided him with gauze and tape so he could take care of his own dressing.

Stewart disputes Dr. Syed's version of this exchange as well.  According to Stewart, his toe remained infected; he was not feeling better; and in fact, he told Dr. Syed that he remained in pain.  Although Stewart claims that ibuprofen was ineffective, it is undisputed that throughout July and August 2016, Stewart had access to ibuprofen for his pain.

On August 29, Stewart submitted an HSR complaining about general foot pain.  Nurse Anderson responded the next day, writing that "MD follow up to discuss is scheduled.  Do know we are currently w/out a provider.  When provider available you will

14

be scheduled." On September 14, Stewart submitted two HSRs complaining of general foot pain and asking to have the doctor's order for special shoes be entered into his records. Nurse Anderson responded that Stewart was scheduled to be seen by a nurse.

### D. Follow-up Care at WRC and Columbia

On September 15, 2016, Stewart was transferred to WRC. There, Stewart continued to complain about foot pain. In addition to the general foot pain related to plantar fasciitis, he continued to have ingrown toenail issues. At the end of September, Stewart was prescribed gabapentin for his foot pain (Ex. 1000 (dkt. #39-1), 116 122 126, 144), and he was later prescribed Lyrica for that pain as well. Doctors there also referred him to an offsite podiatrist.

Six months later, on March 13, 2017, an offsite podiatrist examined Stewart and determined he had first MPJ arthritis and provided Stewart an injection. The podiatrist also recommended permanent removal of the great right toenail. On April 10, 2017, the off-site podiatrist permanently removed that toenail. Dr. Syed opines that it is "highly doubtful" that any details of the right toenail removal in August 2016 contributed to the permanent removal of the right toenail. Rather, the decision whether to remove an ingrown toenail partially or fully is discretionary. Dr. Syed further observes that Stewart appeared susceptible to ingrown toenails, noting that he had experienced ingrown toenails in other toes.

On April 20, 2017, Stewart returned to Columbia. He submitted two HSRs on April 25, 2017, asking to have photos taken of his right foot for his lawsuit against Columbia. He also asked for a medical visit for toenail pain. HSM Gohde responded that

15

the nurse practitioner saw him that day, and that HSU does not take photos.  On April 26, nursing staff saw Stewart for follow-up, noting that his toe did not show signs of infection or swelling, and the skin was pink and healing.

On June 20, 2017, Dr. Syed wrote a prescriber order to discontinue pregabalin. About three weeks later, on July 11, Dr. Syed met with Stewart about his requests for pregabalin and gabapentin.  Dr. Syed concluded that Stewart had an ingrown toenail on his left great toe and offered to remove it.  Stewart refused and asked for a different doctor to remove the toenail.  During that visit, Stewart emphasized his desire for Lyrica (the brand name for pregabalin) and gabapentin for his pain.  However, Dr. Syed saw no medical justification for either medication; he further attests to telling Stewart that he would not promote addictive behavior with other pain medications.

OPINION

## I.    Motion for Sanctions

Stewart filed a motion for sanctions and for default judgment, on the ground that defendants' counsel, Assistant Attorney General Malchow, made a false statement in her declaration in support of defendants' motion for summary judgment.  In particular, he faults Malchow for attesting that the medical records attached to her declaration were all Stewart's, when one page of the exhibit is part of another prisoner's medical record. However, defendants explain that the page was included as a mistake and, regardless, did not represent that this page was part of Stewart's record, which was why defendants sought to redact that page of the exhibit from the public record.  Stewart's speculation that

16

defendants were deliberately misusing other prisoners' medical records is without any evidentiary basis, as is his attempt to use defendants' error as a basis to call into question the accuracy of their representations in support of their summary judgment motion more generally.   Accordingly, seeing no willful misrepresentation by defendants, Stewart's motion will be denied.

## II.   Summary Judgment

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Defendants seek summary judgment in their favor on Stewart's Eighth Amendment and state law claims.[7]

---

[7]  With respect to Stewart's Eighth Amendment claims, defendants also raise qualified immunity as a ground for relief, which the court need not address since the only claims allowed to proceed are against Dr. Syed for well-established standards of deliberate indifference to pain and medical malpractice as set forth below.

### A.     Eighth Amendment

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  Defendants do not seek judgment on the ground that Stewart's ingrown toenail did not constitute a serious medical condition, but instead contend that the evidence of record does not support a finding of deliberate indifference as to any of the defendants.

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, although it requires something less than *purposeful* acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id.* at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment

on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).  Relevant here, a jury may also infer deliberate indifference when the treatment involved an inexplicable delay lacking a penological interest.  *Petties*, 836 F.3d at 729-31.  The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* at 728; *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

### 1.    Dr. Syed

Despite having consistently complained about his ingrown toenail since March of 2016, Stewart claims Dr. Syed did not alter his pain medications or remove the toenail until August of 2016, and even then, he removed it incorrectly and without addressing his ongoing pain.  Dr. Syed's first interaction with Stewart took place on April 4, 2016.  While

Stewart complained about foot pain generally, he made no mention of an issue with his toenail.  In response, Dr. Syed noted Stewart's history of plantar fasciitis and mildly flat feet, provided him ibuprofen, and allowed access to his personal shoes to address that pain.  None of this suggests a failure to exercise medical judgment.

Dr. Syed next met with Stewart a little over a month later, on May 11, but the subject of that visit was Stewart's hypertension and dyslipidemia.   During this appointment, Stewart acknowledges that he did not even report foot pain, much less a more specific concern about toe or toenail pain.  Rather, Stewart was seeking more powerful pain medications (benzodiazepines and gabapentin), which Dr. Syed did not feel were justified, based on his opinion that Stewart had access to other medications and his concern that Stewart might become addicted to those desired medications.

When Stewart finally identified toenail pain on July 21, Dr. Syed directly addressed an x- that concern within just a few days.  Specifically, on July 25, Dr. Syed ordered surgery and nortriptyline for Stewart's pain.  Stewart challenges two aspects of Dr. Syed's orders.  *First*, Dr. Syed inexplicably cancelled the nortriptyline order, leaving him with his existing ibuprofen, 600 mg prescription, Stewart claims that act alone constituted evidence of deliberate indifference, citing the Seventh Circuit's decision in *Conley v. Birch*, 796 F.3d 742 (7th Cir. 2015).   In *Conley*, the plaintiff had suffered a hand fracture, and the defendant provided only painkillers and ice, while plaintiff's medical expert opined that the appropriate treatment would have been to order a splint and x-rays.  *Id.* at 747.  This decision is distinguishable on a number of grounds, the most obvious being that the problem in *Conley* was not just that ibuprofen was insufficient, but that the physician failed

to take necessary steps to determine whether the plaintiff had a broken bone.  In contrast, Dr. Syed responded to Stewart's report of ingrown toenail pain and scheduled him for the nail's removal.  As a result, unlike in *Conley*, Dr. Syed's actions fit Stewart's circumstances.

Still, Dr. Syed appeared to credit Stewart's assertion that his existing prescription of 600 mg of ibuprofen did not resolve his report of severe pain, resulting in his nortriptyline order.  For reasons that remain unclear on this record, Syed then cancelled that order.  On one hand, physicians in Dr. Syed's position are entitled to significant deference when it comes to prescribing medications.  *See Burton*, 805 F.3d at 785 (affirming finding that doctor who declined to prescribe narcotics to detainee was acting reasonably, not in a "substantial departure from accepted professional judgment, practice, or standards") (quoting *Jackson v. Kotter*, 541 F.3d 668, 697 (7th Cir. 2008)); *see also Snipes v. DeTella*, 95 F.3d 586, 591-92 (7th Cir. 1996) ("Using [pain killers] entails risks that doctors must consider in light of the benefits. . . .  Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations.").

On the other hand, deference is given when the record contains some indication that the physician actually exercised medical judgment.  *See Mitchell v. Kallas*, 895 F.3d 492, 501 (7th Cir. 2018) (factual questions related to whether defendant physician exercised medical judgment in denying a prisoner access to hormone treatment precluded summary judgment).  Here, the record is lacking.  Dr. Syed attests only that on July 25, 2016, he ordered nortriptyline to address Stewart's pain, and "[l]ater, it appears I cancelled the order for nortriptyline.  Stewart had other pain relief options at this point, including

my previous prescription for ibuprofen, 600 mg." (Syed Decl. (dkt. #37) ¶ 12.) Yet neither the contemporaneous medical records nor Dr. Syed's affidavit explain *why* he cancelled that order. Indeed, Syed's observation in his affidavit in support of defendants' motion for summary judgment that ibuprofen was still available appears to be an after-the-fact justification for the cancellation.

Absent some explanation as to why Dr. Syed felt that Stewart could manage his pain just as well with ibuprofen as with the stronger pain reliever he ordered could permit a reasonable fact finder to conclude that Dr. Syed's cancellation of the nortriptyline order was not grounded in medical judgment, especially when coupled with: (1) the fact that his ingrown toenail was not removed for another 18 days; (2) Stewart's ongoing complaints to HSU that he remained in severe pain; and (3) the September 2016 decision by WRC physicians to prescribe gabapentin for his pain. Accordingly, Dr. Syed is not entitled to judgment in his favor.[8]

*Second*, Stewart complains that Dr. Syed should have removed his ingrown toenail that day, since it was urgent and his pain was severe. The parties dispute what Dr. Syed actually conveyed to Stewart about the urgency of removal, but for purposes of summary judgment the court must accept that Dr. Syed made statements suggesting that the toenail would be immediately removed. Still, there is no evidence that Dr. Syed *believed* that Stewart's toenail presented an emergency situation and Stewart's evidence in support would not permit a reasonable inference that this was Dr. Syed's judgment on July 25,

---

[8] Nor would he be entitled to qualified immunity, since it is clearly established that Dr. Syed could not act with deliberate indifference to Stewart's severe pain.

2016.  At most, Stewart points to his subsequent medical records from WRC, dated between September 2016 and March 2017, in which staff described Stewart's pain as "chronic," referred him to a podiatrist and prescribed him stronger medications, including Lyrica and gabapentin.  However, those records do not indicate that any of his providers at WRC treated his condition as emergency immediately upon his transfer to WRC, much less suggest that in July of 2016, Stewart's ingrown toenail was an emergency requiring immediate removal.  Rather, when Stewart was transferred to WRC, he was not *immediately* seen by a podiatrist; instead, he met with a podiatrist in March of 2017, six months after he arrived at WRC.  Even then, the podiatrist did not treat his toenail as an emergency; his toenail was not removed for another month.

Critically, Stewart points to nothing in his medical records indicating that any of his care providers at WRC believed his ingrown toenail required emergency surgery or that Dr. Syed mishandled Stewart's ingrown toenail in July and August of 2016.   And acknowledging a disagreement between plaintiff and Dr. Syed as to the need for emergency surgery, even a disagreement between two medical professionals would not prove deliberate indifference on Dr. Syed's part.  *See Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)); *see also Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (while a prisoner is entitled to reasonable measure to prevent a risk of harm, he "is not entitled to the best care possible").

If Dr. Syed knew that Stewart's toenail needed to be removed *that day* and failed to do so, this claim might survive summary judgment.  *See Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) ("deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, . . . delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering").  However, Dr. Syed not only attests that he did not believe that Stewart's toenail required immediate removal, but believed that Stewart's condition did not even *require* surgery, since one of the options available to patients with ingrown toenails is to wait to see if it resolves without intervention.  Stewart's disagreement with Dr. Syed's judgment does not support an inference of deliberate indifference by itself.  *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) ("[A] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances.") (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)).

Relatedly, Stewart faults Dr. Syed for the 18-day delay between his ordering Stewart's toenail removal on July 25 and when it actually took place on August 12, defendants argue that this delay does not support an inference of deliberate indifference.  As an initial matter, defendants argue that the delay cannot constitute deliberate indifference because Stewart has not submitted "'verifying medical evidence' . . . to show how the delay adversely affected" him.  *Reynolds v. Barnes*, 94 F. App'x 672, 674 (7th Cir. 2003) (quoting *Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996)).  This argument goes nowhere since Stewart has submitted evidence suggesting that he actually experienced worsening pain between July 25 and August 12, which is more than sufficient to create a

24

question of fact as to whether the delay "unnecessarily prolonged" Stewart's pain.  *See Williams v. Liefer*, 491 F.3d 710, 716-17 (7th Cir. 2007) (a delay causes harm if it causes plaintiff to endure pain while waiting for treatment).

Assuming the 18-day delay prolonged or even worsened Stewart's pain, defendants' more persuasive argument is that this delay was relatively short, was not a product of any omission by *Dr. Syed*, and was understandable.  In particular, it is undisputed that Stewart was originally scheduled for the procedure the week of July 31, which would have been within a week of Dr. Syed's order.  Given Syed's apparent, medical judgment that the procedure did not need to occur immediately -- Stewart's disagreement notwithstanding -- and that Stewart had access to pain medication in the meantime, no reasonable jury could conclude the initial scheduling of the procedure was constitutionally deficient.  While the two, subsequent delays were unfortunate, both appear reasonable in the institutional context:  (1) there is no dispute that lidocaine was needed for the surgery and needed to be reordered; and (2) Dr. Syed had to deal with a more emergent issue on one of the rescheduled dates.

Furthermore, the evidence of record does not suggest that Dr. Syed was in any way responsible for either of the delays.  Stewart has not submitted evidence disputing either of the reasons given for the delays; instead, he simply argues that his condition was sufficiently urgent to take priority over whatever Dr. Syed had to address.  Again, however, Dr. Syed's judgment was that Stewart's condition was not emergent, and that since the removal was an elective procedure, the delay is not a basis for a reasonable jury to infer that the delays associated with the toenail removal was attributable to Dr. Syed's deliberate

25

indifference.  *See Forstner v. Daley*, 62 F. App'x 704, 706 (7th Cir. 2003) (26-month delay between injury and surgery, caused by transfer of inmate and scheduling appointments not deliberate indifference); *Zimmerman v. Prison Health Servs., Inc.,* 26 F. App'x 202, 203 (7th Cir. 2002) (delay due to "bureaucratic obstacles" and "scheduling difficulties" is not deliberate indifference).  Of course, as noted above, repeated delays may render Dr. Syed's unexplained cancellation of stronger pain medication for Stewart more suspect in the eyes of the jury.6.

*Finally*, Stewart asserts that Dr. Syed botched the August 12 toenail removal.  In particular, Stewart claims that Dr. Syed did not actually administer lidocaine for the procedure, then botched the procedure itself by removing only part of the toenail, leaving him in ongoing pain.  No physician has opined that Dr. Syed's decision to remove only part of the toenail constituted deliberate indifference, and the record of Stewart's treatment at WRC and by a podiatrist in March 2017 does not indicate that Dr. Syed's decision to perform a partial removal in August of 2016 lacked medical judgment. Therefore, the court will not let the question of whether the removal procedure constituted deliberate indifference go to the jury.  However, the court will allow the jury determine whether Dr. Syed's management of Stewart's pain during and after the removal constituted deliberate indifference.   Indeed, according to Stewart, Dr. Syed failed to administer lidocaine during the procedure, and subsequently failed to prescribe any stronger medication ibuprofen after Stewart continued to complain of pain on August 15.

Accordingly, Stewart will be allowed to proceed to trial against Dr. Syed for cancelling his order for nortriptyline, failing to use lidocaine during the procedure, and failing to manage Stewart's post-removal pain reports adequately.

### 2.     Jamie Gohde

Stewart's claim against Gohde is premised on his belief that Gohde, as HSM in 2016, was aware of his repeated complaints about pain and need for medical attention for his ingrown toenail. However, Stewart has offered no admissible evidence from the medical records that contradicts Gohde's representation that she played no role in Stewart's medical care. This is a problem for Stewart, since to be held liable under § 1983, a plaintiff must prove the defendant's personal participation or direct responsibility for the constitutional deprivation. *Mitchell*, 895 F.3d at 498 (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016). More specifically, "a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728).

While Stewart points to the HSRs that he addressed to Gohde specifically, HSRs are not necessarily routed to the health care professional listed on the form, and regardless, it is undisputed that the HSU staff triage HSRs according to the urgency of the inmate's complaint. Since there is no dispute that *Gohde* responded to *none* of the HSRs Stewart directed to her, and Gohde attests that she did not review those HSRs, a reasonable jury could not find that Gohde was personally involved in the treatment of Stewart's toenail between March and August of 2016.

Appearing to acknowledge as much, Stewart argues that Gohde must be held accountable for the delay in treatment for his ingrown toenail because, as HSM, she would meet daily and weekly with HSU staff.  Even assuming that Gohde had daily interactions with HSU staff, however, a reasonable jury could not find that staff informed her about Stewart's numerous HSRs, much less about how other nurses and doctors were responding. Absent such evidence, Gohde cannot be held liable simply by virtue of her supervisory role over the HSU:  "Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (citation omitted).  Therefore, "for a supervisor to be liable, they must be 'personally responsible for the deprivation of the constitutional right.'"  *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)).  Indeed, to establish personal involvement, the supervisor must "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'"  *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).  Since Stewart only speculates that Gohde knew about his HSRs, no reasonable trier of fact could conclude that she had sufficient personal involvement to hold her liable under § 1983.  Accordingly, Gohde is entitled to judgment in her favor on the merits.

28

### 3.   Denise Valerius

Nurse Valerius actually responded to eight of Stewart's HSRs, but none supports an inference of deliberate indifference.  As an initial matter, Valerius responded to Stewart's April 9, 2016, HSR asking that Dr. Syed's order allowing him to wear personal shoes be entered into the computer system, by indicating that she entered the order, which Stewart disputes.  He further asserts that Valerius's failure to enter the order left him in pain because he was forced to wear state-issued boots.  The parties do not provide details about whether Dr. Syed's authorization needed to be formalized, but even assuming that it was a requirement, Valerius's apparent failure to enter the order does not permit an inference of deliberate indifference.  No evidence of record suggests that Valerius knew that the order was not actually in place after failing to record it, nor that Stewart followed up to inform Valerius that he was unable to wear his personal shoes because of this omission.  As a result, Valerius's claimed mistake in responding to Stewart would, at most, constitute negligence, but at least by itself is not sufficient to permit an inference that she consciously disregarded his possible suffering because she did not enter Dr. Syed's order into the computer system.  *Burton*, 805 F.3d at 785 ("Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough.") (quoting *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987)).

Moreover, in her subsequent May 7 and June 11 responses to Stewart's HSRs, Valerius gave Stewart *exactly* what he requested:  an appointment with Dr. Syed and a refill form for his ibuprofen.  Although Stewart claims that he submitted the May 7 HSR earlier,

he does not submit evidence that Valerius was aware of the HSR before May 7. Accordingly, neither of these responses permit an inference of deliberate indifference.

In fairness, Valerius's July 23, July 24, July 31 and August 6 responses to Stewart's HSRs are problematic. By that time, Stewart had been seen in the HSU on July 6, and he raised a concern about his foot and the time it took him to see a doctor. Additionally, although nursing staff provided Stewart ibuprofen on July 19, Stewart reported that (1) his feet still caused him pain and (2) the ibuprofen and naproxen were not working. In responding to the July 23 and 24 HSRs, Valerius wrote only that he was scheduled with the doctor for the following week. While Stewart faults Valerius for failing to do more to address his complaints, it is undisputed that she lacked the authority to modify his medications without Dr. Syed's involvement. Moreover, given that Stewart's primary goal was to consult with Dr. Syed about his pain management, *and* that it is undisputed Stewart met with Dr. Syed the day after Valerius responded to those HSRs, Valerius's arguable failure to do more than confirm that Stewart was scheduled to see the doctor would not support a finding of deliberate indifference. At most, Valerius's failure to take further action amounted to negligence or possibly recklessness, neither of which are constitutional violations.

Valerius's July 31 and August 6 responses to Stewart's HSRs were similarly justified. In his July 31 HSR, Stewart wanted to know when Dr. Syed would be cutting out his toenail, and Valerius responded that the procedure was scheduled for that week, which was correct at the time. Although the procedure was rescheduled later, there is no evidence suggesting that Valerius knew the procedure would have to be rescheduled when she

responded to Stewart's HSR.  As for the August 6 HSR, Stewart accused HSU staff of deliberate indifference and reported major pain, to which Valerius again accurately responded that the doctor was called away and his procedure had to be rescheduled.  At that point, it is unclear what more Valerius could have done to address Stewart's concerns. The procedure had been rescheduled, and Valerius lacked any authority to hasten the procedure or offer other medications beyond the 600 mg of ibuprofen that Dr. Syed had approved, making her decision to limit her response to explaining the situation to Stewart understandable and certainly not actionable.

Perhaps Stewart would have preferred Valerius to have taken the additional step of scheduling Stewart for a nurse visit that day, but his assertion that he should have been seen that day does not establish that Valerius's response exhibits deliberate indifference. *Budd v. Motley*, 711 F.3d 840, 844 (7th Cir. 2013) (while plaintiff was dissatisfied with his medical care, deliberate indifference claims were properly dismissed because the record established that he had "received medical attention, medication, testing and ongoing observation").  In any event, Stewart's chief complaints were the delayed procedure and his pain level, and Dr. Syed had previously declined to prescribe him gabapentin, nortriptyline or any other medication stronger than ibuprofen.  While Valerius could "not unthinkingly defer to physicians and ignore obvious risks to [Stewart's] health," *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) (citation omitted), there is no evidence that Valerius knew more was needed after Dr. Syed approved pain medication and Stewart was scheduled to meet with him.

Finally, after Stewart's August 12 toenail removal, Valerius met him on August 13 and changed his dressing.  No evidence suggests that Valerius failed to exercise her medical judgment, or even mishandled his dressing change, that day.  Accordingly, on this record, it would be unreasonable to infer that Valerius's responses to his HSRs constituted deliberate indifference.

### 4.    Kerry Buechner

Nurse Buechner also had eight interactions with Stewart without evidence of deliberate indifference to his complaints of pain.  Between March 8 and 9, Buechner both responded to Stewart's HSR asking to be seen for a "skin and feet problem," as well as examined him personally.  In response to Stewart's complaints of pain, she ordered him ibuprofen and ice for one month.  Given Stewart's complaint was only that his state-issued boots hurt his feet, this degree of care obviously does not support an inference that Buechner failed to exercise professional judgment.  Similarly, after Stewart's two June 28 HSRs contained complaints about knee and foot pain and asked for Tylenol and to see someone "ASAP," Buechner responded by informing Stewart that he was scheduled for a doctor's appointment and that ibuprofen had been ordered for him, rather than Tylenol.  Although Buechner might have had the authority to schedule Stewart for a visit with nursing staff, because Stewart included a request for a different medication, it was not unreasonable for her to infer that Stewart wished to see a physician, not a nurse.

Buechner's responses to Stewart's July 21 and July 27 HSRs are also not problematic, because each time, she provided Stewart with what he wanted in his requests.

In the July 21 HSR, Stewart wanted to see a doctor, and in the July 27 HSR, he wanted information from a past appointment put in writing, to which Buechner reported that an appointment had been scheduled and provided the information from the earlier appointment.  To the extent Stewart would fault Buechner for not arranging him to be seen by Dr. Syed *sooner*, no evidence of record suggests that Buechner had the authority to change Dr. Syed's schedule.

Buechner's response to Stewart's August 10 HSR was similarly reasonable.  Stewart had complained that Dr. Syed had prescribed him a new pain medication (nortriptyline), but he had not received it, and Buechner responded that Dr. Syed cancelled the order.  No evidence indicates that *Buechner* had reason to question that decision.  Regardless, she was entitled to defer to Dr. Syed's decision and relay it to Stewart.  On August 12, Buechner similarly responded to his HSR reporting ingrown toenail pain by informing him that he would be seeing Dr. Syed that day, which did take place.

Finally, the *only* interaction Buechner had with Stewart following his August 12 partial toenail removal was on August 13, when she responded to his HSR request to be seen.  Given that Stewart had been seen that day already, there is no reasonable inference that Buechner was obliged to take any further action, much less acted with deliberate indifference.

Ultimately, while in responding to Stewart's HSRs at the end of June and July -- when his reports of pain were persistent and more severe -- Buechner *may* have had the discretion to schedule Stewart for an appointment with a nurse, but her failure to do so simply does not demonstrate deliberate indifference.  In particular, Stewart's real desires

33

were for stronger medications and to see a doctor, and Buechner lacked any authority to provide either.  Accordingly, Buechner is entitled to judgment in her favor as well.


B.    **State Law Claims**

Finally, defendants seek judgment on the merits of Stewart's Wisconsin negligence claims against defendants.  The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial.  28 U.S.C. § 1367(c); *Burritt v. Diflefsen*, 807 F.3d 239, 252 (7th Cir. 2015).  Here, since the court is dismissing all of Stewart's federal claims against all defendants except Dr. Syed, the court declines to exercise supplemental jurisdiction over his state law claims against those other defendants.  Subject to the applicable Wisconsin statute of limitations, Stewart may pursue his negligence claims against defendants Gohde, Buechner and Valerius in state court.  In contrast, Stewart's negligence claim against Dr. Syed will proceed to trial along with his federal deliberate indifference claims.[9]

---

[9] Defendants argue that Stewart's failure to identify an expert to testify to the applicable standard of care entitled them to judgment on his state law claims.  However, that rule is not universal:  if it would be obvious to a lay jury that Dr. Syed breached his duty of care in failing to provide effective pain medication, then expert testimony is unnecessary.  *See Gil v. Reed*, 535 F.3d 551, 557-58 (7th Cir. 2008) (in proving medical negligence under Wisconsin law, a plaintiff "may show that an ordinary person could conclude from common experience that he could not have been injured had his medical providers exercised care") (citing *Richards v. Mendivil*, 200 Wis. 2d 665, 548 N.W.2d 85, 889 n.5 (Ct. App. 1996))).  Given the court's conclusion that a jury might conclude that Dr. Syed exercised *no* medical judgment when he cancelled the nortriptyline order, failed to use lidocaine, and failed to prescribe a stronger medication after the removal, Stewart does not need expert testimony to prove this claim.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #34) is GRANTED in part, with respect to plaintiff Travis Stewart's Eighth Amendment deliberate indifference claims against defendants Gohde, Buechner and Valerius, and DENIED in part, with respect to Stewart's Eighth Amendment deliberate indifference and state law negligence claims against Dr. Syed as set forth above, which will proceed to trial.

2. Plaintiff's motion to sanction and enter default judgment (dkt. #41) is DENIED.

3. The court also declines to exercise supplemental jurisdiction over Stewart's state law claims against defendants Gohde, Buechner and Valerius, which are DISMISSED without prejudice.

4. At the close of this case, the clerk of court is directed to enter judgment in favor of defendants Gohde, Buechner and Valerius, as provided above.

5. To accommodate the court's calendar, the January 7, 2021, telephonic scheduling conference is RESET for **January 20, 2021, at 10:30 a.m.** Counsel for defendant is responsible for initiating the call to the court.

Entered this 28th day of December, 2020.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge